# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 1:25-cr-00211-CRC |
| JENNIFER MAY, | |
| Defendant. | |

## DEFENDANT JENNIFER MAY'S MEMORANDUM IN AID OF SENTENCING

Defendant, Jennifer May, through undersigned counsel, hereby submits this memorandum in aid of sentencing in the above-captioned matter and states as follows:

### Introduction

Jennifer May made a very serious mistake when she misused funds she had received from an Economic Injury Disaster Loan ("EIDL") early in the COVID-19 global pandemic. Like many people at that time, Ms. May—a single mother and sole proprietor with no criminal history—was extremely concerned about her financial stability and allowed her nerves to get the better of her. When the government approached her about her conduct, Ms. May did not fight, deflect, or attempt to pass the buck. Rather, she chose to quickly resolve this matter through an early, pre-indictment plea agreement with the government. And pursuant to that agreement, Ms. May pled guilty at an August 27, 2025 hearing in this matter to one count of wire fraud in violation of 18 U.S.C. § 1343. Ms. May has remained in the community since that day, and has fully complied with all conditions of her release.

On December 9, 2025, Ms. May will appear before this Court for sentencing in this matter. At that time, undersigned counsel, along with the U.S. Probation Office for the District of Columbia ("Probation"), will seek a downward variance from the United States Sentencing

Guidelines ("USSG") and ask this Court to sentence Ms. May to a period of probation with conditions and restitution, which is the minimum sentence necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a) (hereinafter "§ 3553"), so she can continue to provide critical support and care for her wife, who is battling Stage III breast cancer, and her three young children, who face the possibility of foster-care placement if Ms. May is incarcerated. We submit that such a sentence is appropriate and sufficient, but not greater than necessary, to achieve the statutory goals of sentencing in this matter.

## Relevant Procedural Background

On July 29, 2025, the government filed an Information charging Ms. May with one count of wire fraud, in violation of 18 U.S.C. § 1343. *See* ECF No. 1. On August 27, 2025, Ms. May appeared before the Court to plead guilty to the sole count in the Information, which she candidly and successfully did. The Court scheduled sentencing in this matter for December 9, 2025, and asked Probation to complete a pre-sentence investigation and report. Probation submitted its final report and sentencing recommendation on December 1, 2025. *See* ECF Nos. 15, 16.

## Relevant Factual Background

### I.    Jennifer May's Personal Background and Family Circumstances

Ms. May is a 42-year-old mother who has spent her adult life caring for and supporting her family above all else. She has three young children—Valerie (11 months), Delilah (2 years), and Merritt (4 years)—who rely on Ms. May exclusively for their day-to-day care, financial stability, and emotional support. In September 2025, Ms. May married her partner of the past four years, Monica Gonzales-Medina. The five of them now live together as a family in Washington, D.C.

Sadly, Ms. Gonzales-Medina has been diagnosed with Stage III breast cancer, for which she is being treated with chemotherapy over the next several months. After the chemotherapy is completed, and after a lengthy recuperation period, Ms. Gonzales-Medina will then undergo a double mastectomy and daily radiation treatment. As Ms. Gonzales-Medina's treating oncologist, Dr. Ami Chitalia, notes, Ms. Gonzales-Medina is experiencing "multiple significant side effects related to her chemotherapy treatment," including "marked peripheral neuropathy" that has led to "impaired mobility." Dr. Chitalia also indicates that Ms. Gonzales-Medina needs a long-term caregiver "to assist with her ongoing medical and functional needs," including activities of daily living, as well as meal preparation and general support to maintain her safety and well-being." See Letter from Ami Chitalia, MD (dated November 17, 2025), attached here as Exhibit A. Indeed, Ms. Gonzales-Medina relies exclusively on Ms. May for the day-to-day care Dr. Chitalia describes, including transportation to and from medical appointments and treatment and general support, as she battles this terrible illness.

As the Presentence Report ("PSR") confirms, there are no suitable alternative caregivers prepared to step in if Ms. May is removed from the home to serve a period of incarceration, as Ms. May's immediate family members are either unable or unwilling to assist in caring for the children. As indicated above, Ms. May's wife is battling for her life through an aggressive course of chemotherapy and an upcoming major surgery, which makes it nearly impossible for her to provide any meaningful care and support for Ms. May's three very young children. Ms. May has no relationship with her mother, Susan May, who Ms. May believes is unemployed and living in Hawaii. And although Ms. May's relationship with her father, William May, is in tact, it too is strained. Mr. May's presence in Ms. May's life is sporadic, and his wife (Ms. May's

stepmother) had made clear that she will not allow Ms. May's children to live with them should Ms. May be incarcerated in this matter.

Ms. May's relationship with her brother, Benjamin May, is also unstable. Indeed, the two are not currently on speaking terms after Ms. May asked Benjamin to move out of her house (he had been living with her for a period in 2024) and he became enraged and attempted to break down her front door with a baseball bat. Accordingly, Benjamin is not a viable option regarding custodial responsibility for Ms. May's children. And while Ms. May does have two close friends who have offered to help (albeit without a firm commitment to taking responsibility for the children), Ms. May would have to send Valerie to one of the friends and Merritt and Delilah to the other. Needless to say, separating these young children from one another, on top of from their mother, is simply untenable.

These unfortunate circumstances leave Ms. May as the only stable individual capable of maintaining continuity and care within the home environment. Given her wife's fragile health and limited physical capacity, and the young ages of her children, the loss of Ms. May—even temporarily—would disrupt all aspects of the family's financial and emotional foundation, from schooling to medical care to housing. This result is not in anyone's interests.

The strains on the household over the past year have been extreme. The PSR notes Ms. May herself has suffered substantial anxiety and depression connected to financial stress and caregiving overload, as well as the weight of this case. Yet, Ms. May continues to prioritize the health and needs of those she loves. Meanwhile, her wife faces a life-threatening illness that requires constant oversight and the presence of a caregiver with the physical and emotional strength to navigate complex medical decisions and treatment schedules.

Ms. May's ongoing presence in the home is not merely beneficial—it is essential to the survival and well-being of her wife and children.  Removing her would create cascading and irreversible harm for innocent family members who are already submerged in daily struggle.  This family's circumstances present precisely the type of situation where a custodial sentence would be "greater than necessary" within the meaning of § 3553: the children's lives would be upended, the continuity of their care destroyed, and their mother's stabilizing influence potentially replaced by foster-care placement with strangers.  And for Ms. May's wife, the absence of her sole caregiver could materially undermine her medical outcomes and emotional resilience.

## II.    The Instant Offense

Ms. May's conduct here—the misuse of a COVID-era EIDL—happened early in the then-emerging global pandemic.  That time was rife with financial anxiety and personal stress that were exacerbated by the rapidly changing health landscape and the demise of many foundational pillars, such as stable, in-person education, flourishing employment, and physical wellbeing.  Schools and businesses closed, social isolation became the norm, and the economy was thrown into upheaval.  For people like Ms. May—a self-employed entrepreneur with a family to support—the economic uncertainty loomed large.  It was under these unprecedented and dire circumstances that Ms. May misappropriated the EIDL funds in a terrible lapse in judgment that had otherwise served Ms. May well until that point.

As evidenced by Ms. May's pre-indictment guilty plea and cooperation with the government in resolving this matter promptly to avoid the expenditure of unnecessary resources, Ms. May is deeply sorry for her actions and accepts full responsibility for what she did.  Although it certainly does not provide an excuse, the context in which this offense occurred is

important to understanding why Ms. May—a single mother and business owner with no criminal record—felt compelled to do what she did to generate revenue.  Again, while not an excuse by any stretch, these circumstances provide insight that is certainly relevant to sentencing considerations such as the likelihood of recidivism (which, we submit, is nonexistent), *see* § 3553(a)(2)(c), and Ms. May's personal characteristics and the nature and circumstances of the offense, *see* § 3553(a)(1).  And as the letters of support from Ms. Mays friends, family, and colleagues demonstrate, Ms. May is fundamentally a good, honest person who simply made a serious mistake that she hopes will not define who she is for the rest of her life.[1]

## Sentencing Law and Considerations in This Case

### I.    General Principles

Pursuant to the Sentencing Reform Act of 1984, the United States Sentencing Commission promulgates the USSG.  During the early part of their existence, these guidelines were mandatory in that, in many cases, judges had very little discretion to impose a sentence that was not within a guidelines range.

Following the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), and *Gall v. United States*, 552 U.S. 38 (2007), however, the USSG became voluntary, and not even "presumptively reasonable."  *Gall, supra*, 552 U.S. at 47.

As the Supreme Court stated in *Gall*:

> "As an initial matter, the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range. See *id.* at ——, 127 S.Ct., at 2467 ('The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness'). Even the Government has acknowledged that such a presumption would not be consistent with *Booker*.  See Brief for United States in *Rita v. United States,* O.T.2006, No. 06–5754, pp. 34–35."

---

[1] The letters of support are attached here as Exhibit B.

*Id.*

*Gall* set forth a three-step procedure that a sentencing court must follow when deciding an appropriate sentence: *first*, the court must properly determine the guidelines range applicable to a particular defendant; s*econd*, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guidelines range; and *third*, the court must consider all the factors set forth in § 3553 as a whole, including whether a variance is warranted. *Gall, supra,* 552 U.S. at 47.

Section 3553, in turn, states that a court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [the statute]." Thus, when determining the specific sentence to impose, a court must consider:

1) The nature and circumstances of the offense and the history and characteristics of the defendant.

2) The need for the sentence imposed to

    a) Reflect the seriousness of the offense;

    b) Promote respect for the law and provide just punishment for the offense;

    c) Afford adequate deterrence to criminal conduct;

    d) Protect the public from further crimes of the defendant; and

    e) Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

5) The need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct; and

6)  The need to provide restitution to any victims of the offense.

As we discuss below, application of all these sentencing considerations warrants a downward variance in this case so that Ms. May can remain available as the primary caregiver to her young, dependent children and her sick wife.

## II.  Applicable Sentencing Guidelines Range for Ms. May's Conduct and Justification for Variance

### A.  Applicable Range Under The USSG.

Pursuant to the terms of the plea agreement between Ms. May and the government, the parties agreed to the following guidelines calculation under USSG §§ 2B1.1(a)(1) and 2B1.1(b)(1):

- Base level:                                                             <u>7</u>

- Specific Offense Characteristics                        <u>14</u>
  (loss amount greater than $550,000 but
  less than $1,500,000)

- **Total offense level**                                        **<u>21</u>**

Ms. May and the government further agreed that a 2-level reduction under USSG § 3E1.1 would be appropriate if Ms. May clearly demonstrated acceptance of responsibility, which we submit she has, and that an additional 1-level reduction pursuant to USSG § 3E1.1(b) was appropriate for Ms. May's substantial assistance by providing timely notice of her intention to plead guilty.  Accordingly, the adjusted offense level adopted by the parties (assuming the application of the 3-level reduction described above) is **<u>18</u>**.  However, Ms. May is entitled to an additional 2-level reduction pursuant to USSG § 4C1.1 because she has no criminal history (and thus is a "zero-point offender" in criminal history Category I) and because she is not otherwise

8

disqualified from the application of § 4C1.1.  Thus, the defense submits that Ms. May's final adjusted offense level is **16**.

Probation concurs with this calculation, with one exception: it believes that a 2-level increase is warranted under USSG § 2B1.1(b)(12) because the offense involved conduct that falls within the ambit of 18 U.S.C. § 1040 (fraud in connection with major disaster or emergency benefits).  Probation's final calculation under the USSG, therefore, is **18**.  Ms. May and the government objected to the application of USSG § 2B1.1(b)(12), *see* ECF Nos. 11, 13, and we submit that the Court should not apply it here for the specific reasons the government discussed in its Obligation and Response to Presentence Report (ECF No. 11).

*    *    *    *    *

As noted above, Ms. May submits that the correct adjusted offense level here is **16**.  Under the USSG, the sentencing range for this offense level, with no criminal history, is 21 months to 27 months in prison and an estimated fine range of $10,000 to $95,000.  As we discuss in more detail below, we concur with Probation that a "significant downward variance," Sentencing Recommendation (ECF No. 16) at 2, is appropriate and will ask the Court to impose a period of probation without a fine at sentencing.

### B.    Justification For a Variance in This Case.

The Court is required to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  18 U.S.C. § 3553(a).  In fashioning an appropriate sentence for Ms. May, the Court should consider the significant and irreplaceable caregiving role she plays for both her dependent young children and her seriously ill wife, who is battling Stage III breast cancer, and for whom Ms. May is the primary caregiver.  Removing Ms. May from her family for any term of imprisonment—even at the low-end of the USSG range, as the

government recommends—would inflict severe and unnecessary harm on her innocent dependents and spouse, contrary to the intent of the statute.

>    **1.    Ms. May Is the Irreplaceable Primary Caregiver to Her Young Children.**

Ms. May has three young children, ages 11 months, 2 years, and 4 years. As Ms. May conceived each of them through in vitro fertilization with donor sperm, she is, and always has been, their sole, full-time, hands-on caregiver and parent. Given their very young ages, it goes without saying that they rely on Ms. May for daily care, transportation, meals, medical appointments, school involvement, and the emotional stability they cannot receive from any other adult in their lives. As noted above, Ms. May's immediate family members are simply not viable caregivers for these children. Nor is Ms. May's wife given her life-threatening health issues. As a result, there is no suitable alternative caregiver ready to step in and assume parental responsibilities if Ms. May is incarcerated. This creates a very real possibility that Ms. May's children would have to be placed in foster care, which is not the outcome anybody wants here.

Courts have long recognized extraordinary family circumstances as a basis for a downward departure, and the same rationale applies to variances, as Ms. May and Probation seek here. The loss of "an *irreplaceable* caretaker of children, elderly, and/or seriously ill family members" can support a downward departure/variance where "the extent of the departure appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration." *United States v. Leon*, 341 F.3d 928, 931-32 (9th Cir. 2003) (affirming downward departure where the defendant was the "sole caregiver" for minor children and incarceration would "cause extraordinary hardship") (emphasis in the original); *see also United States v. Husein*, 478 F.3d 318, 327 (6th Cir. 2007) (noting that a caregiver is "irreplaceable" even with available alternatives where those alternatives are not "feasible" and "relatively

comparable to the defendant," and finding downward departure appropriate where defendant cared for disabled parents and minor siblings) (citation omitted); *United States v. Muñoz-Nava*, 524 F.3d 1137, 1141 (10th Cir. 2008) (finding "extraordinary" family circumstances supporting downward departure where defendant was sole caregiver of eight-year-old child and elderly parents with serious medical problems).

The harm to Ms. May's young children if she were incarcerated is certain, severe, and entirely disproportionate to the goals of sentencing. Although Ms. May does have immediate family members, as discussed above, none of them is a "feasible" alternative to Ms. May to be a caregiver for her very young children. Therefore, Ms. May is "irreplaceable" as a caregiver to her children. If Ms. May were incarcerated, even briefly, her children would suffer significant harm to their early-childhood development, mental health, and educational continuity, among other things. This harm would compounded by orders of magnitude if the children were also subjected to forced placement with strangers.

Protecting vulnerable children from traumatic disruption or displacement aligns with the statutory command that sentences reflect "just punishment," not needless suffering of third parties who bear no culpability for the offense. For these reasons alone, a downward variance under § 3553 is warranted here.

### 2. The critical medical care Ms. May's wife requires makes Ms. May's continued caregiving indispensable.

However, Ms. May also serves as the primary caregiver for her wife, who suffers from Stage III breast cancer, and, as discussed above, requires assistance with activities of daily living and consistent supervision and support. Without Ms. May's care, her wife faces the very real prospect of inpatient or institutionalized care—which would come at significant additional

emotional and financial cost for an already fragile individual—which would also compound the situation with respect to Ms. May's children.

For the same reasons set out above, Ms. May's irreplaceable role as the primary caregiver for her seriously (indeed, potentially terminally) ill wife warrants the downward variance Ms. May and Probation are seeking.

**C.    A Non-Custodial Sentence Would Fully Satisfy § 3553(a)**

A downward variance here that resulted in a non-custodial sentence would still serve the interests of justice and the mandate of § 3553.  Ms. May has no prior criminal history, has fully accepted responsibility for the instant offense, has expressed genuine remorse, and has complied with all conditions of release since her guilty plea in August.  The offense here, while undoubtedly serious, was non-violent, and, under the circumstances (*i.e.*, the COVID-19 pandemic), was *sui generis.*  There is absolutely no legitimate risk of recidivism that requires lengthy incarceration to deter Ms. May or protect the public.

On the other hand, a sentence of community supervision, restitution, and strict compliance with conditions would:

- ensure continued financial and caregiving support for Ms. May's young children and seriously ill spouse;

- allow Ms. May to seek and maintain employment, which will be necessary both to support her family and maximize restitution payments; and

- achieve deterrence without destabilizing vulnerable family members.

This Court has broad discretion to consider humanity as well as punishment.  A sentence that keeps Ms. May available to her family, while still holding her accountable, would best reflect the totality of circumstances here.

## Conclusion

For the foregoing reasons, and for any other reasons the Court might consider, Ms. May respectfully submits (1) that the adjusted offense level in this case is **16**; (2) that the applicable guidelines range is 21-27 months of incarceration with an estimated fine of $10,000 to $95,000; (3) that a downward variance is warranted; and (3) that the Court should impose a probationary sentence with restitution and conditions such that the sentence is appropriate and sufficient, but not greater than necessary, to achieve the statutory goals of sentencing in this matter.

Dated: December 4, 2025        Respectfully submitted,

*/s/ Philip Andonian*
Philip Andonian (D.C. Bar No. 490792)
MESSNER REEVES LLP
1100 H Street, N.W., Suite 315
Washington, D.C. 20005
Tel: (771) 210-2160
Email: pandonian@messner.com

*Counsel for Defendant Jennifer May*

## <u>CERTIFICATE OF SERVICE</u>

I, Philip Andonian, hereby certify that on December 4, 2025, I served a copy of the

foregoing sentencing memorandum on all counsel of record via the Court's CM/ECF system.

/S/ Philip Andonian
Philip Andonian

**EXHIBIT A**



MedStar Health

GONZALEZ MEDINA, MONICA
745 10TH ST SE
WASHINGTON, DC 20003

November 17, 2025

To Whom It May Concern,

This letter is to certify that Ms. Medina Gonzalez has been diagnosed with Stage III
breast cancer and is currently under my care at MedStar Washington Hospital Center
in Washington, DC.

Ms. Gonzalez is undergoing aggressive chemotherapy on a weekly basis for a total
duration of three months, which will be followed by six weeks of radiation therapy. She
is experiencing multiple significant side effects related to her chemotherapy treatment,
including increased weakness, decreased appetite, and marked peripheral neuropathy.
The neuropathy has resulted in impaired mobility, and she currently requires the use of
a walker for ambulation.

It is important to note that recovery from these side effects can take up to one year
following the completion of all planned therapies. During this time, Ms. Gonzalez will
benefit greatly from long-term caregiver support to assist with her ongoing medical
and functional needs. She requires help with activities of daily living, as well as meal
preparation and general support to maintain her safety and well-being.

If additional information is needed, please feel free to contact my office.

Sincerely,

Ami Chitalia, MD
Oncology Attending Physician
Medstar Washington Hospital Center
202-877-9693

Name: GONZALEZ MEDINA,
MONICA                                                      DOB: 08/16/1971

**EXHIBIT B**

Gary S. Whidby
6019 Wescott Hills Way
Alexandria, VA 22315

November 23, 2025

Judge Christopher R. Cooper
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Your Honor:

I have had the privilege of knowing Jennifer May for over 15 years. We first met while working together in the call-time room on political campaigns when we were both working, in our own way, to make a positive impact on our communities. Since then, I have come to know Jennifer as a person of exceptional integrity, compassion, and dedication.

Jennifer consistently demonstrates a deep sense of responsibility and care for those around her. She prioritizes her family, friends and clients, but above all her children and spouse, for whom she serves as the primary caregiver.

In every interaction I have had with Jennifer, she has shown herself to be thoughtful, dependable, and selfless even when it comes to little things, like when she knew I was working solo late at night, and came to assist me for weeks on end to finish a project. Over the years, I've seen her provide opportunities to others to better themself, offering a hand-up when others had given up. She approaches challenges with grace and ensures that the well-being of her loved ones remains her top priority.

I wholeheartedly attest to Jennifer's dedication to her family, friends and community. I am confident that anyone who knows her would agree that she is a person of exceptional principle and care.

Sincerely,

*Gary S. Whidby*

Gary S. Whidby

To whom it may concern,

I am writing in support of my friend Jennifer May.

I have known Jennifer since 2011.  She has been a source of love, comfort, fun, and kindness to me for as long as I have known her.

I know Jennifer to be smart, kind, and a very giving person. Jennifer cares about others– and generally wants what is best for those in her life and around her.  She tries to help others when she can and has been a mentor to many.  I respect and admire Jennifer's compassion and endless ability to provide help and support to those in need– regardless of how well she knows them.

Jennifer is the mother to 3 beautiful children.  She has created a world for them in which they are loved, heard, and respected.  They will all grow up to be wonderful adults who will do many good things for the world.

In my interactions with Jennifer over the years, I have known her to be a good friend, mother, and human being.  She is an upstanding citizen and a respect worthy individual.


Mandi Karp

Jennifer B. Boysko
P.O.Box 247
Herndon, Virginia 20172
jennifer@jenniferboysko.com
703-587-9141

November 26, 2025

The Honorable Christopher R. Cooper
U.S. District Court for the District of Columbia
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Your Honor:

I have served the people of Virginia for nearly 20 years — first as community liaison for the Fairfax County Board of Supervisors, then in the Virginia House of Delegates, and now in the Virginia State Senate. During my time in public service, I have had the privilege of working with many dedicated and service-minded professionals. I am writing to you today to share my experience with Jennifer May, who supported my 2024 congressional campaign as our compliance professional.

Campaigns are demanding environments, and the work of compliance is rarely noticed by the general public. Yet it is essential — it is the foundation that allows everything else to proceed with integrity. Jennifer understood that better than anyone I have worked with. She took on her responsibilities with seriousness, humility, and a deep sense of care for the people around her. I quickly came to rely on her calm presence, her clarity, and her steady professionalism.

What struck me most about Jennifer was not only her technical skill, but her *kindness* and her willingness to shoulder burdens that others never saw. She treated every member of my team with respect, regardless of title or seniority. She offered guidance when we needed it, reassurance when things felt overwhelming, and patience throughout the many stresses that come with a competitive campaign. It was clear that she carried a great deal of responsibility — not because she had to, but because she cared deeply about doing what was right.

Jennifer's integrity was evident in every interaction we had with her. She asked thoughtful questions, flagged potential issues early, and made sure we understood not just *what* to do, but *why* it mattered. Many people approach this work as a checklist; Jennifer approached it as a commitment to fairness, honesty, and public trust. I found that deeply reassuring, and it is something I admire.

While I cannot speak to matters outside my experience, I can say without reservation that Jennifer was someone who brought decency, sincerity, and conscientiousness into her work. She helped our team navigate a demanding process with confidence, and she did so with the kind of quiet professionalism that often goes unnoticed but is absolutely invaluable. I am grateful for her contributions to our campaign and for the steadiness she brought to all of us.

Thank you for taking the time to consider my perspective. I hope my letter provides you with a fuller picture of the person I came to know — someone who worked hard, cared deeply, and treated others with respect and compassion.

Respectfully,

Jennifer B. Boysko
Senate of Virginia
Representing District 38

You Honor,

My name is Kenneth May, I am a retired Life Safety Coordinator, who worked for a large financial firm in New York & New Jersey. I am also the Uncle of Jennifer May for whom I am writing to you about today.

While not only being a deeply devoted single mother of 3 beautiful children, Jennifer is deeply involved in family and family traditions. Several years back she took the reins of the May-Campbell Family Reunion, which I would like to say just celebrated our 116th Annual Reunion in Chesapeake, Virginia, and she is works tirelessly on the family tree, which now has over 6,000 people on it.

Speaking of tradition, Jennifer along with my parents, Jennifer's grandparents, who passed away several years ago, started a family dinner night held on the 1st Tuesday of each month. The family would gather around a table to enjoy a well-prepared meal. Well, things change and family members move farther away. Jennifer, who never gives up, stated we can still enjoy the tradition by using Zoom. So, whoever is not able to attend dinner at the host location can join the family wherever they are. This is still an on-going and a beautiful way for my grandson and her children to know each other even though they live hundreds of miles away.

Your Honor, I don't know how this works, but I would like to say that my niece, Jennifer May, is centered and has a genuine wish to compassionately, thoughtfully and actively strive to make our world a better place.


Thank you for your time.

Kenneth May

# Robert P. Goldstein

*301 Massachusetts Ave, NW, Apt 903*
*Washington, DC 20001*
goldsteinpoliticalconsulting@gmail.com
(202) 386-2039 Mobile


The Hon. Christopher R. Cooper
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Dear Judge Cooper,

I am writing with regard to Jennifer May, whom I have come to know as a warm, generous human being, a loving mother to her three children and a stalwart friend to everyone who knows her.

I first reached out to Jenn in the fall of 2018, at a time when I was in desperate need of a job, and she hired me on the spot, although we had never before met.  It was clear to me immediately that she was someone who valued her employees as human beings and not just as worker drones.  It was a pleasure working with Jenn every single day and I will forever be grateful to her for that experience and for enabling me to now have a productive and successful career in a field that I was previously only minimally qualified to work in.

My most memorable moments with Jenn, however, were outside of work, seeing her with her family and the rambunctious but loving home she has created for her kids.  She and I also both have a tremendous love for animals and we shared many wonderful moments with her two dogs and my first dog (all of them now gone), as well as my current dog Scout.  Jenn and experienced together both great love and great loss with our dear pets, and that is something that I will never forget.

In short, I simply wanted to share with you my great regard for this wonderful human being, Jennifer May, whom it has been my enormous pleasure to know for the past seven years and for many more years to come.

Respectfully,

*Robert P. Goldstein*

# John W. Foust

## Foust Law, PLLC

1750 Tysons Blvd, Suite 1500
McLean, VA 22102

C. 703-618-6900                                                      Admitted to Bar:
E. jfoustva@gmail.com                                                Virginia
                                                                     District of Columbia

November  28, 2025

The Honorable Christopher R. Cooper
U.S. District Court for the District of Columbia
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Your Honor:

My name is John Foust. I am an attorney and a former member of the Fairfax County Virginia
Board of Supervisors, where I served the Dranesville District for 16 years. During my time in
public office, I chaired the Audit Committee and several other committees and worked
extensively with county staff, legal counsel, and federal and state partners on matters requiring
accuracy, transparency, and public trust. I write today in support of **Jennifer May**, who served as
the compliance professional for my unsuccessful 2014 congressional campaign.

Although Ms. May and I did not work closely on a day-to-day basis, I relied on my staff who
interacted with her directly, and their assessment of her work was always consistent: she was
thorough, responsive, organized, and conscientious. Campaign finance is a complex and highly
regulated environment. I understood from my team that Ms. May provided clear guidance, timely
filings, and a level of professionalism that gave them confidence in the accuracy of our reports.

My longtime campaign treasurer and senior staff, who were responsible for maintaining our
books and overseeing all financial activity, spoke of Ms. May with respect and appreciation.
They found her to be supportive, straightforward, and diligent in ensuring that everything we
submitted met the standards required by the Federal Election Commission. Their confidence in
her work earned my confidence as well.

As an attorney and as a former elected official, I place significant value on integrity and attention
to detail in anyone entrusted with financial compliance. The work requires not only technical
skill but a mindset grounded in reliability, ethical conduct, and respect for the process. Based on
the experience of the people I trusted to run my campaign's finances, and based on the smooth
and accurate reporting produced under their collaboration with Ms. May, I believe she embodies
those qualities.

Although I cannot speak to the specifics of her current circumstances, I can say without hesitation that my campaign's experience with Ms. May was entirely professional and entirely positive. I am grateful for the work she provided to my team, and I offer this letter to share my perspective on her character and the quality of her service.

Thank you for your time and consideration.

Respectfully,

John W. Foust

John W. Foust
Attorney
Former Fairfax County Virginia Supervisor, Dranesville District

November 25, 2025

Judge Christopher R. Cooper
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Dear Judge Cooper,

I am writing on behalf of my friend of over 20 years, Jennifer "Jenn" May. Jenn and I first met through a mutual acquaintance while we were still in college. Over the years our friendship deepened beyond eager young professionals with a similar career and passion to real friends. Jenn has been there for me on some of my happiest days - marriage and birth - and also been there for some of the darkest - miscarriage and illness. She is the type of person who would do anything for someone in need if she could, and I've seen her leadership and dedication to helping folks in both personal and professional settings. Throughout her career she has gone out of her way to uplift young women in an industry traditionally dominated by men and offered mentorship and opportunities to so many.

Perhaps most beautiful of all is watching Jenn's journey in raising a family and the joy her children bring to her. I know her three young children not only love her dearly but would be devastated to be separated from their mother. I have known Jenn to be nothing but an upstanding citizen and kind person through our 20+ year friendship. I hope that throughout this process you take into account that Jenn is not a risk to anyone and has a very young family that depends on her both financially and emotionally.

If I can be of any further assistance, my contact information is below.

Thank you,
Jackie Cornell
732-423-0534
jackiecornellnj@gmail.com

The Honorable Judge Cooper,

Kindly allow me to take a moment and introduce myself. I am Bill, Jennifer's dad.

Since Jenn was a little girl, she was the type of child who gave 100% of herself in everything she did.. Jenn excelled in high school while working multiple jobs.   She even stayed in DC to spend her college summers working and taking classes so she could graduate from American University a year early since we couldn't afford to assist with paying for college.

She is one of the hardest workers I've seen and one of the kindest people I know. This has led her to take on too much and sometimes be taken advantage of by friends, family, colleagues, and employees, and yet she still has a big heart. When my son was homeless during COVID, Jenn had him move in. When he lost his car, she paid to get it back. When the family needed someone to carry on our annual Family Reunion tradition, Jenn stepped up. When friends or acquaintances were in need of help, she always said yes to helping no questions asked.

Although currently facing difficult times due to medical issues with her partner, she continues to hold her family together. Jenn is the sole caregiver of her partner as well as a mom to three young and active children. She works tirelessly to teach the children academically, while also building their social skills. She is currently ensuring her children have a loving and well-rounded childhood. My grandchildren are learning firsthand through Jennifer's actions how to face adversity with strength and grace, and are actively learning the importance of hard work, love, patience and honesty. Through these life lessons, they will learn integrity and perseverance.

I'm asking your Honor to please take into consideration the extenuating circumstances. Your Honor, I am pleading for your mercy as her father, and as the grandfather of her children. My wife and I work full time in New Jersey, and it would be impossible for us to take care of our grandchildren, if Jennifer became incarcerated. Your Honor, I am asking you to please take into account every consideration for my daughter. It would destroy her and irreparably harm the children if they ended up in foster care. I am humbly asking for her to please be allowed to stay with her young children and her spouse, who is currently undergoing a long and time-consuming treatment for breast cancer.

Thank you, Your Honor, for your time and consideration

Kind regards

William "Bill" May



**CAMBRELENG**
**& MARTON**

ATTORNEYS AT LAW

**Rebecca Cambreleng**
(503) 477-4899
rebecca@workplacelawpdx.com

November 21, 2025

The Honorable Christopher R. Cooper
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

    Re:    *Letter in Support – Jennifer May*

Judge Cooper:

    My name is Rebecca Cambreleng, and I am writing today in my personal capacity in support of Jennifer May who is coming up for sentencing on December 9, 2025.

    I have known Jenn since I was in law school in Washington, DC about 20 years ago. After graduating school in DC, we both attended school at NYU at the same time – Jenn obtaining her MBA and I was obtaining my LL.M.

    During the year we spent attending school together, a lot of my free time was spent getting to know Jenn and her family. I would travel with her to New Jersey to her father's house and would spend time with the family during holidays when I wasn't able to make it back west to see my family.

    After graduation, Jenn moved back to DC to start her business and I stayed in New York City for a time working. Even after I moved back to the west coast, I would come east every year to visit friends and would spend time with Jenn in DC.

    I have spent the last 20 years of my career working in the law and am currently a partner in my own law firm and a Judge Pro Tempore in Washington County, Oregon. I have dedicated my life to helping people in need and making sure that justice is upheld.

    I do not believe justice in an abstract concept – I believe that it should be the undercurrent of everything that we do, and I strive to make sure I am being just in every decision I make and in every case I litigate.

    When I first learned about what was happening to Jenn, I could not wrap my head around it. She was one of the most ethical people I had known – she ran a successful business helping people comply with campaign finance laws and had tried to take a struggling business and revive it to give children in DC a safe place to play while their adults were able to relax.

CAMBRELENG & MARTON LLC

As a single mom myself, I understand how hard it is to juggle a business and family, and I have watched in awe as Jenn has juggled multiple businesses all while having three children.

I'm not here to judge what has happened, what choices were made, or what the outcome of her plea might be. Knowing Jenn as I do, I believe she made a mistake. I believe she will be paying for that mistake for the rest of her life whether she is sentenced to prison time or whether she is allowed to serve her time at home. She will have to create a new life for herself and her family, as she has been the sole breadwinner for her three children from the beginning. She will not be able to run her business anymore, and as a felon will have limited opportunities in any professional field. She will forever have this mistake follow her and keep her from living the life she would have otherwise had.

I am here to ask that you take into consideration the circumstances of Jenn's life when you are deciding her sentence. Incarceration would not make any difference here. She is not violent. She is not dangerous. She is not someone who needs to be taken away from her family. I believe that ripping her away from her children and her spouse who is currently undergoing treatment for breast cancer would be a gross miscarriage of justice. I believe that between the guilt and fear of the future, Jenn is already serving her sentence. I ask that you please allow her to stay home to serve the remainder.

Sincerely,

Rebecca Cambreleng

21st November 2025


Judge Christopher R. Cooper
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004


To The Honorable Christopher R. Cooper,

My name is Paul Heck, I am writing on the behalf of my friend Jennifer May.

Jennifer is someone who cares about every person she comes across. I would like to share a moment that showed this to me. During the holiday season, while most people were heading to their families homes to celebrate, I found myself alone and nowhere to go. Jennifer kindly invited me to her home and to celebrate with her family. It didn't end with that. Jennifer also proceeded to purchase me small but thoughtful presents for Christmas and matching PJs so I would get to be part of a family for the holiday. She already had plenty on her plate with a full house of children and other family members that had come. She still made it feel like home to me.

Jennifer is a kind person who focuses on work and her family. She is not someone who seeks to disrupt the life that she has. Jennifer is a loving mother and a kind friend. Whenever I need help I know I can rely on Jennifer to answer the call. That is just who she is.


Sincerely,
Paul Heck

*Paul Heck*

Shaun Daniels
6233 Glyndon Lane
Richmond, VA 21201
daniels.shaun@gmail.com
703-554-5119

November 25, 2025

The Honorable Christopher R. Cooper
U.S. District Court for the District of Columbia
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Your Honor:

My name is Shaun Daniels, and I currently serve as the Director of Campaigns & Programs at REPRO Rising Virginia. I have worked in political campaigns for nearly twenty-five years, beginning in 2000 and managing races since 2007. Over that time, I have been responsible for hiring, overseeing, and relying on compliance professionals in some of the most tightly regulated, scrutinized, and high-pressure environments in American politics.
It is from this vantage point — and with complete sincerity — that I write in support of **Jennifer May**, whom I have known and worked with since 2014.

Jennifer first entered my professional life through an emphatic recommendation from the Democratic Congressional Campaign Committee. I quickly saw why. From the outset, she demonstrated a rare combination of competence, integrity, steadiness, and judgment that made her indispensable. Campaigns are chaotic environments, driven by urgency and emotion, and Jennifer has always been the calm adult in the room — the one person whose work I never had to second-guess.

Across multiple cycles and multiple states — congressional races in 2014 and 2016, a Maryland campaign in 2017–18, and a congressional primary in 2024 — I entrusted Jennifer with responsibilities requiring absolute honesty and precision. I have also relied on her insight in years when we were not formally working together. She has advised me on hiring, helped me identify reputable vendors (including competitors when she could not take on the work herself), guided me through ethical questions, and offered clarity during moments when I needed it most. Her guidance has shaped not only my own work but that of many teams I have led.

One experience captures this quality particularly well. After the 2024 campaign concluded, Jennifer conducted an unsolicited audit of our records and discovered a series of online charges that did not align with any campaign spending. As it turned out, a volunteer had mistakenly used a card number saved from a retailer we had used for our election night

event, unintentionally making several personal grocery purchases. This individual is a person of considerable means and immediately reimbursed the campaign — but the point is that **no one else would have caught it**. Jennifer did. Quietly, attentively, and without fanfare. And this is only one example. I could not begin to estimate how many issues she has prevented over the years, both for my teams and for countless others.

I work in a field where mistakes can be reputationally fatal and where, unfortunately, not everyone tasked with safeguarding funds or filings performs with the care that is required. I have seen embezzlement, negligence, and malfeasance firsthand. But never — not once — have I had a moment of concern with Jennifer. She approaches compliance as a moral responsibility. She protects her clients because she feels a genuine duty to do things the right way.

That sense of duty extends far beyond paperwork. Jennifer has helped campaigns offer health insurance at times when it was not common practice. She has researched liability policies for campaigns struggling to find coverage. She has carried emotional and administrative weight on behalf of staff, candidates, and volunteers who often do not realize what she has taken on. She has done the work that is invisible and unglamorous but foundational to the functioning of a democratic process. A world without people like Jennifer is a world with less integrity in it.

It has been personally difficult to witness this moment for someone whose entire career has been defined by ethics, rule-following, and conscientious professionalism. For a person who has spent so many years keeping the rest of us on the straight and narrow, this circumstance feels profoundly wrong at a human level. I offer that observation not in judgment of the proceedings, but as an honest reflection of how sharply this situation contrasts with everything I have known about her character.

If I were hiring a compliance firm tomorrow, Jennifer May would be my first call — without hesitation or qualification. I have full respect for her integrity. I have complete trust in her judgment. And I have absolute confidence in her decency, reliability, honesty, and commitment to service.

Thank you for taking the time to read this letter and for considering my experience with someone who has been not only a valued professional partner but a genuine friend whose judgment and character I hold in the highest regard.

Respectfully,

**Shaun Daniels**
Director of Campaigns & Programs
REPRO Rising Virginia

Sue Boucher
1854 Griffith Road
Falls Church, VA 22043
sue.boucher@verizon.net
(703) 472-7123

11/28/2025

The Honorable Christopher R. Cooper
U.S. District Court for the District of Columbia
333 Constitution Ave, NW
Courtroom 27A
Washington, DC 20004

Your Honor:

My name is Sue Boucher, and for many years I served as the campaign treasurer for John Foust, both during his tenure on the Fairfax County Board of Supervisors and for his 2014 congressional campaign. In addition to that role, I have served as treasurer for several local committees, nonprofit organizations, and other community-based efforts. I have spent many years helping charitable and civic groups manage their finances, often doing the unglamorous and meticulous work that keeps these organizations functioning, all as a volunteer. I am also a longtime Fairfax County resident and retired county employee, and I remain deeply involved in the community I care about.

I share this background because it has shaped how seriously I take issues of financial accuracy, accountability, and trust. When I worked with **Jennifer May**, who served as our campaign's compliance professional during the 2014 congressional race, I relied on her partnership in meeting those standards.

As the person responsible for deposits, expense records, account reconciliation, and the back-and-forth preparation needed for our Federal Election Commission filings, I interacted with Jennifer frequently and at every level of detail. I can say without hesitation that she was one of the most reliable and conscientious partners I have ever worked with in any setting, political, charitable, or civic.

Jennifer approached every part of her job with care. She was thorough in her reviews, clear in her explanations, and patient when walking me through questions or unusual items. She met every deadline, anticipated issues before they became problems, and always made sure our filings were accurate. I never once had to worry about whether something had been missed or whether a detail would fall through the cracks. When Jennifer was involved, I knew the work would be done properly.

I also found Jennifer warm, respectful, and easy to work with, even during the long days and quick turnarounds that campaigns often require. She handled every interaction with a calm professionalism, and she made my job, which can be stressful and tedious, far easier.

I wanted you to have an accurate sense of the person Jennifer was to those of us who depended on her. She was steady, dependable, and committed to doing things the right way. Working with her gave me great confidence that our reporting was accurate and fully compliant, and I valued her work enormously.

Thank you for taking the time to read my letter and for considering my perspective.

*Sue Boucher*

**Sue Boucher**
Community Volunteer and Former Fairfax County Employee